SCHLUETER 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00294-CV







J. H. Schlueter and Richard Stephen Schlueter, Appellants



v.



Karen Sue Schlueter, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NO. 93-07612, HONORABLE MARY PEARL WILLIAMS, JUDGE PRESIDING







 This is an appeal by appellant Richard Schlueter from a divorce action he filed
against appellee Karen Schlueter as well as an appeal by appellant Hudson Schlueter who was
joined in a third party action brought by Karen for conspiracy and fraud. Judgment was granted
on a jury verdict against Richard and Hudson for actual and punitive damages. The court awarded
$12,850 to the community estate for the fraud against the community to be assessed against
Richard and Hudson, jointly and severally. The court also granted judgment to Karen for punitive
damages in the amount of $30,000 against Richard and $15,000 against Hudson. Richard appeals
in seven points of error; Hudson appeals in a single point of error. We will affirm the judgment
of the trial court.



BACKGROUND


 Richard and Karen Schlueter were married on June 7, 1969, and had two children. 
For most of the marriage, Richard worked for IBM and, at the time of his retirement, was earning
$42,000 per year. Karen was employed by the state and earned around $29,000 per year.

 In December 1992, Richard and a co-worker, Charlie King, agreed to invest as
equal partners in emus. Richard and King each paid $2,750 towards the first pair of emus. Then,
after agreeing to purchase a second pair of birds for $3,600, Richard and King each paid $500 as
a down payment. Richard testified that, because of the probable expenses and possible losses
involved, he decided that he could not be involved in the business due to his impending retirement
from IBM. So, after investing at least $3,250 in the emus and without receiving any profits from
the business, Richard decided on May 3, 1983 to sell his interest in the business to Hudson for
$1000.

 Although Karen knew that Richard had invested in emus, she did not know the
details. In fact, Karen did not discover that Richard had sold his interest in the emus to Hudson
until after Richard filed for divorce. Testimony indicated that the emu business, which Richard
sold to Hudson for $1,000 shortly before he filed for divorce, was worth at least $10,000.

 Then, as a result of IBM's downsizing, Richard agreed to accept an incentive bonus
in exchange for his early retirement. Richard received an incentive check from IBM of
$30,360.41 on May 28, 1993, his last day of work. At Richard's request, Hudson picked up the
check from Richard while he was still at work and deposited it in his own account.

 When Richard returned home after his last day of work, Karen told him that she
wanted a divorce. Richard and Karen's marriage had serious problems over a period of a couple
of years, and according to Karen, they had grown apart. In fact, one night in April 1993, while
engaged in sexual intercourse, Richard asked Karen if she loved him and she answered no. 
Richard testified that many people have problems and that he believes that his marriage "healed"
after this incident and "kept going for a long time." That night, Richard went to his parents'
house and, according to Richard, told them for the first time about the couple's problems and the
impending divorce. Although claiming to be shocked when Karen gave him the news, Richard
was the one who actually filed for divorce on June 24, 1993.

 Richard told Hudson to hold the IBM incentive check in his own account, until he
"figured out what was going to happen here." Then, on June 17, 1993, one week before Richard
filed for divorce, Hudson wrote himself a check from the account in the amount of $12,565. 
Richard and Hudson testified that this amount represented money borrowed by Richard over the
last thirty years, both before and after his marriage to Karen. Hudson testified that he kept a log
book in which he recorded most of the financial transactions that he had with his four children,
including Richard. In conjunction with the book, Hudson had notes signed by Richard
representing all of the individual debts recorded in the log book. In their deposition testimony,
Richard, Hudson, and Richard's mother, Betty, agreed that each of these notes was created and
signed by Richard at the actual time he borrowed money from his parents. At trial, however, all
three changed their testimony to indicate that, on the advice of an estate planning attorney,
Hudson created the notes in the late seventies to provide evidence of the debts in addition to the
log book.

 Karen testified to having no knowledge of any unpaid debts that she or Richard
owed to Hudson or Betty. In fact, on several occasions, Richard bragged that he was very proud
of the fact that he was the only one of four children who did not owe his father any money. 
Richard, however, attempts to clarify this in his testimony, claiming that what he actually meant
was that he and Karen had paid back all of the obligations that they had borrowed for specific
purposes during their marriage and that he only owed Hudson money that he had borrowed years
before.

 Evidence at trial showed that, in 1984, a divorce action was filed against Hudson's
oldest son, John. At the end of the trial, John was ordered to pay an attorney ad litem who
represented John's children in this action. The court found that John transferred some property
to Hudson in an attempt to avoid paying the attorney ad litem. The court further found that
Hudson had notice of his son John's intent to delay or defraud the attorney ad litem in the
collection of her fee.

 In this case, Richard filed for divorce on June 24, 1993. Karen answered the action
and filed a counterclaim seeking appointment as managing conservator of the children,
reimbursement to the community estate of assets expended on behalf of Richard's separate estate,
and attorneys' fees. Karen also brought a tort action and a third-party claim against Richard and
Hudson, alleging that they were guilty of fraud, breach of fiduciary duty, and conspiracy.



DISCUSSION


 Appellant Hudson Schlueter, in his sole point of error, and appellant Richard
Schlueter, in his first point of error, contend that the trial court erred in admitting evidence
concerning Hudson Schlueter's "other acts" during his son John's 1984 divorce in violation of the
Texas Rules of Civil Evidence. Specifically, Hudson and Richard objected on three grounds: (1)
the evidence was irrelevant; (2) the probative value of this evidence was substantially outweighed
by the danger of unfair prejudice and misleading of the jury; and (3) the evidence was not
properly admitted under any exception to Rule 404(b) of the Texas Rules of Civil Evidence. The
trial court overruled appellants' objections and allowed them a running objection to all such
evidence. Further, as requested, the trial court instructed the jury that this evidence was only
applicable to Hudson and should not be considered against Richard.

 In order to obtain a reversal of a judgment based upon error of the trial court in
admission or exclusion of evidence, an appellant must show: (1) that the trial court did in fact
commit error; and (2) that the error was reasonably calculated to cause and probably did cause
rendition of an improper judgment. Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396
(Tex. 1989). The admission or exclusion of evidence rests with the sound discretion of the trial
court. New Braunfels Factory Outlet v. IHOP, 872 S.W.2d 303, 310 (Tex. App.--Austin 1994,
no writ). The trial court commits error only when it acts in an unreasonable and arbitrary
manner, or acts without reference to any guiding principles. Beaumont Bank, N.A. v. Buller, 806
S.W.2d 223, 226 (Tex. 1991).

 Evidence is relevant if it has "any tendency to make the existence of any fact that
is of consequence to the determination of the action more probable or less probable than it would
be without the evidence." Tex. R. Civ. Evid. 401. All relevant evidence is admissible unless it
is shown that the evidence should be excluded for some other reason. Tex. R. Civ. Evid. 402. 
In this case, the question is whether the evidence that Hudson aided his son, John, in an illegal
act during John's 1984 divorce would make it more or less probable that Hudson would participate
with his other son, Richard, in fraudulent behavior during Richard's divorce. On both occasions,
Hudson was involved with his sons who were each going through a divorce and engaged in actions
which apparently served to benefit them financially. There is a direct and logical connection
between Hudson's 1984 actions and his alleged fraudulent behavior in this case which serves to
make Hudson's alleged acts more probable. Thus, the contested evidence is clearly relevant. See
Service Lloyds Ins. Co. v. Martin, 855 S.W.2d 816, 822 (Tex. 1993).

 Evidence of other wrongs or acts is generally not admissible to prove the character
of a person to show that he acted in conformity with that character on a particular occasion. Tex.
R. Civ. Evid. 404(b). Such evidence may be admissible, however, to show motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id. Karen
concedes that evidence of Hudson's 1984 actions cannot be used to show that he acted in
conformity with those actions. She does, however, urge that such evidence would be admissible
under a Rule 404(b) exception.

 The evidence shows that Hudson paid Richard $1,000 for the emu business which
had supposedly become a financial problem for Richard. This is despite the fact that Richard had
already invested $3,250 into the business and that Charles King, Richard's partner, claimed the
business to be worth at least $10,000. Then, shortly after helping Richard with his financial
problem, Hudson took possession of Richard's $30,360.41 IBM incentive check and wrote himself
a check for $12,565, allegedly repaying money that Richard had borrowed over the last thirty
years. Further, to verify these debts, Hudson produced some notes on various scraps of paper
signed by Richard and dating back to the sixties. In their deposition testimony, Hudson, Betty,
and Richard indicated that Richard had signed each of these notes at the time he borrowed the
money. At trial, when faced with the testimony of Karen's forensic documents examiner, all three
of them changed their testimony to indicate that Richard actually signed the notes in the late
seventies at the suggestion of Hudson's estate planning attorney. Based on this evidence, we
agree that the evidence of Hudson's 1984 actions was admissible in this case if nothing more than
to show his motive and intent to assist his children, whether legally or illegally, as they struggled
through the financially draining process of divorce. See Tex. R. Civ. Evid. 404(b); Porter v.
Nemir, 900 S.W.2d 376, 381 (Tex. App.--Austin 1995, no writ).

 Hudson contends that, even if his 1984 actions were relevant, the trial court
erroneously introduced them into evidence because the probative value of this evidence was
substantially outweighed by the danger of unfair prejudice and misleading the jury. See Tex. R.
Civ. Evid. 403. Hudson relies on a four-part balancing test set forth in a criminal case,
Montgomery v. State, 810 S.W.2d 372, 392-93 (Tex. Crim. App. 1990), and applied to civil cases
by McClellan v. Benson, 877 S.W.2d 454 (Tex. App.--Houston [1st Dist.] 1994, no writ), to claim
that the trial court committed reversible error when it allowed Hudson to be questioned regarding
his son John's 1984 divorce.

 This Court has declined to adopt the Montgomery test in civil cases as suggested
by McClellan. See Porter, 900 S.W.2d at 381 n.6. Further, we have noted that "[b]ecause of
the severe consequences of applying Rule 403--the exclusion of relevant evidence--the application
of the rule `is an extraordinary remedy that must be used sparingly.'" Trevino v. Department of
Protective & Regulatory Servs., 893 S.W.2d 243, 248 (Tex. App.--Austin 1995, no writ) (quoting
LSR Joint Venture No. 2 v. Callewart, 837 S.W.2d 693, 698 (Tex. App.--Dallas 1992, writ
denied)). Little evidence in a lawsuit will not be prejudicial to at least one party. Porter, 900
S.W.2d at 381.

 In weighing the prejudice, we must first examine the necessity for and probative
effect of the evidence. Trevino, 893 S.W.2d at 249. Both sides agree that the ultimate issue for
which the evidence was offered was whether Hudson conspired with his son Richard to defraud
Karen and the community estate. As stated above, other evidence presented at trial shows Hudson
to be engaging in conduct detrimental to the community estate.

 Hudson's actions were taken at a time when Richard and Karen were having marital
difficulties and could certainly indicate a motive and intent on Hudson's part to defraud Karen and
the community estate. Hudson's 1984 actions help to clarify Hudson's motive and intent in this
case. It is unlikely that the introduction of this evidence caused the jury to lose sight of the
specific issues they were called upon to decide. See Porter, 900 S.W.2d at 382. Accordingly,
the trial court did not abuse its discretion in determining that the danger of unfair prejudice did
not substantially outweigh the probative value of the evidence.

 Richard adopts Hudson's arguments as his own and further contends that, because
he was not involved in the 1984 transaction in any way, the court's limiting instructions did not
cure the error. Richard argues that, if the 1984 judgment made it more probable that Hudson
acted fraudulently, it necessarily made it more probable that Richard acted fraudulently. We
disagree.

 The disputed evidence clearly went to the issue of Hudson's motive and intent. 
Before the jury heard the evidence, the court directly and adequately instructed the jury to
consider this evidence only as it applied to Hudson and to not hold it against Richard. We believe
the instruction was effective in neutralizing any danger of unfair prejudice. McClellan, 877
S.W.2d at 459. Because we do not find that the trial court committed error in admitting the
evidence in question, we overrule Richard's first point of error as well as Hudson's sole point of
error.

 In his second point of error, Richard argues that the trial court erred in granting
judgment to Karen for $30,000 in exemplary damages against Richard because Karen failed to
submit a jury issue on whether Richard had acted intentionally or maliciously in committing fraud
against Karen. Richard did not object at trial to the court's failure to submit this jury issue, and
he raises this point for the first time on appeal. Any error in failing to submit a question was
waived. See Tex. R. App. P. 52(a); Rodgers v. RAB Invs., Ltd., 816 S.W.2d 543, 551 (Tex.
App.--Dallas 1991, no writ). "Furthermore, when one or more of the elements of a ground of
recovery are submitted to the jury, and one or more of the elements are omitted, a failure to object
to the omission waives the complaint." Rodgers, 816 S.W.2d at 551 (citing Tex. R. Civ. P. 279). 
Some evidence exists to support the omitted issue, and thus it is deemed found by the court in
support of the judgment. Id. We overrule Richard's second point of error.

 In his third point of error, Richard asserts that the trial court erred in awarding
$30,000 to Karen in exemplary damages based upon Richard's fraud because fraud is not a
separate cause of action in a divorce case which will support a personal judgment in favor of the
other spouse. Richard argues that, because both the judgment and the verdict in this case were
in Karen's favor and the trial court did not include the award as part of the division of the parties'
assets and liabilities, the $30,000 exemplary damage judgment is fatally flawed and must fail.

 Specifically, Richard relies on Belz v. Belz, 667 S.W.2d 240 (Tex. App.--Dallas
1984, ref'd n.r.e.). In Belz, the husband filed for divorce, and the wife, in addition to her cross
action for divorce, alleged fraud on her community interest in the marital estate and sought actual
and exemplary damages. Id. at 242. The husband's fraud on the wife's community interest was
tried as a separate cause of action, and the wife received both actual and exemplary damages. In
reversing the judgment of the trial court, however, the Dallas Court of Appeals held that:



the trial court's submission of the issue of [the husband's] fraud on [the wife's]
community interest as a separate common law action in tort for fraud was
erroneous, and that in actuality [the wife] had only a claim for the value of her
interest in the community property wrongfully displaced by [the husband]. The
basis for this claim is [the husband's] fraud on the community which may be
asserted, in the context of a divorce and property division, for the trial court's
consideration in the division of the estate of the parties.



Id. at 246. In other words, a claim of fraud on the community is a means of obtaining "a greater
share of the community estate upon divorce, in order to compensate the wronged spouse for his
or her lost interest in the community estate." Thus, according to the Dallas court, the wife has
a right to recover the value of her community interest in the property which the trier of fact finds
to be depleted wrongfully from the estate, but only in conjunction with the property division. Id.
at 247.

 The supreme court in 1977 abolished the doctrine of interspousal immunity to the
extent that it would bar all claims between spouses for wilful and intentional torts. Bounds v.
Caudle, 560 S.W.2d 925, 927 (Tex. 1977). Then, in 1987, after Belz was decided, the supreme
court abolished the doctrine completely as to any cause of action, including negligence claims. 
Price v. Price, 732 S.W.2d 316, 319 (Tex. 1987). "Under the rules established in Caudle and
Price, there appears to be no legal impediment to bringing a tort claim in a divorce action based
on either negligence or an intentional act such as assault and battery." Twyman v. Twyman, 855
S.W.2d 619, 624 (Tex. 1993).

 Admitting that fraud is an intentional tort, the Belz court attempted to distinguish
its holding from the supreme court's holding in Bounds as well as from the San Antonio Court
of Appeals' decision in Mogford v. Mogford, 616 S.W.2d 936, 940 (Tex. Civ. App.--San Antonio
1981, writ ref'd n.r.e.), which held that a trial court could properly render judgment, as part of
the divorce proceedings, against a spouse for injuries resulting from willful and intentional torts
committed upon the spouse during marriage. In Belz, the court noted that both Bounds and
Mogford involved actions for personal injuries to the spouse resulting from intentional torts and
that recovery by a spouse for personal injuries is characterized as separate property. Belz, 667
S.W.2d at 246. Because the fraud in Belz was not perpetrated upon the wife to the detriment of
her separate estate but rather on her interest in the community estate, the court held that a
judgment for fraud on the community is not one that could stand alone in the absence of a
property division. Id. at 247; see also In re Marriage of Moore, 890 S.W.2d 821, 829 (Tex.
App.--Amarillo 1994, no writ) (agreeing with Belz that no independent cause of action for fraud
on the community, with separate damages, may be brought in a divorce action).

 The court in Twyman, however, stated that joinder of tort claims with the divorce
was encouraged when feasible because "[r]esolving both the tort and divorce actions in the same
proceeding avoids two trials based at least in part on the same facts, and settles in one suit `all
matters existing between the parties.'" Twyman, 855 S.W.2d at 625 (quoting Mogford, 616
S.W.2d at 940). The supreme court's language in Bounds and then later in Price and Twyman is
direct and unambiguous. The doctrine of interspousal immunity was abolished so as to allow a
spouse to bring any cause of action against his or her spouse.

 In Belz, the Dallas Court of Appeals attempts to create an exception to Bounds, thus
breathing new life into an abolished doctrine. Because we believe that it is our duty to follow the
decisions of the Texas Supreme Court, we decline to follow the rationale of the Belz court. See
Bruno v. Bruno, 589 S.W.2d 179, 180 (Tex. Civ. App.--Waco 1979, writ ref'd n.r.e.) (citing
Swilley v. McCain, 374 S.W.2d 871, 875 (Tex. 1964)). The supreme court clearly abolished the
doctrine of interspousal immunity and is certainly capable, without our assistance, of reviving that
doctrine, in whole or in part, if it should ever feel the need. Accordingly, we overrule Richard's
third point of error.

 In his points of error four, five, and six, Richard contends that the trial court erred
in failing to include all the money judgments against Richard and Hudson as community assets and
community liabilities and in making a grossly disproportionate division of property which
amounted to an abuse of discretion. We disagree.

 The trial court acted properly in not including the two awards of exemplary
damages in the community estate. See In re Marriage of Devine, 869 S.W.2d 415, 429 (Tex.
App.--Amarillo 1993, writ denied). The court in Twyman, however, warned that more difficult
than deciding whether a tort claim may be brought in a divorce action is deciding when the tort
claim must be brought and how the tort award should be considered when making a "just and
right" division of the marital estate. Twyman, 855 S.W.2d at 624. 



When a tort action is tried with the divorce . . . it is imperative that the court avoid
awarding a double recovery . . . . Therefore, when a factfinder awards tort
damages to a divorcing spouse, the court may not consider the same tortious acts
when dividing the marital estate . . . . [A]n award for tortious conduct does not
replace an analysis of the remaining factors to be considered when the trial court
divides the marital estate. The court may still award a disproportionate division
of property for reasons other than the tortious conduct. To avoid the potential
problem of double recovery, the factfinder should consider the damages awarded
in the tort action when dividing the parties' property.



Id. at 625 (citations omitted). Broad discretion is given to trial courts in making a just and right
division of the community estate, and we will not disturb this discretion on appeal unless a clear
abuse of discretion is shown. Murff v. Murff, 615 S.W.2d 696, 698 (Tex. 1981). The test for
abuse of discretion is whether the court acted without reference to any guiding rules and
principles. Capellen v. Capellen, 888 S.W.2d 539, 543 (Tex. App.--El Paso 1994, writ denied). 
Further, it is presumed that the trial court exercised its discretion properly. Murff, 615 S.W.2d
at 699.

 As indicated in its findings of fact, the trial court considered many factors in
making this division, including:



(1) Relative earning capacity of the parties;


(2) Attorneys' fees incurred and paid or owed to be paid by Karen at the time of
trial;


(3) Future employability of the spouses;


(4) Earning power, business opportunities, capacities, and abilities of the
spouses;


(5) Nature of the property involved in the division;


(6) Wasting of community property by the spouses;


(7) Creation of community property by the efforts of Karen; and


(8) Other matters . . . relating to the wrong doing of Richard.



In light of these factors and the evidence in the record, we do not believe the court abused its
discretion in awarding a disproportionate division of property to Karen along with the damages
for Richard's and Hudson's tortious conduct. We overrule these points of error.

 In his seventh point of error, Richard asserts that the trial court erred in awarding
Karen attorneys' fees because the jury considered attorneys' fees in its award of damages for
fraud. Richard argues that it is highly probable that this error resulted in a double recovery for
Karen because her total attorneys' fees were $31,041.65, an amount almost identical to the jury's
award of $30,000 in exemplary damages. Karen responds by claiming that the punitive damage
amount is not a grant of attorneys' fees and that the expenditure of attorneys' fees was just one
factor that was considered in arriving at the amount of an award of punitive damages.

 As stated above, we agree that when a tort action is tried with a divorce action, it
is imperative that the trial court avoid awarding a double recovery. Twyman, 855 S.W.2d at 625. 
A trial court's wide discretion, however, in making a just and right division of the community
estate will not be disturbed on appeal without a clear abuse of discretion. Murff, 615 S.W.2d at
698. It is well established that a trial court in a divorce action can award attorneys' fees to either
party as part of the property division based on the conditions and needs of the parties and all the
surrounding circumstances. Parker v. Parker, 897 S.W.2d 918, 935 (Tex. App.--Fort Worth
1995, writ denied). Further, a trial court's award of attorneys' fees may include appellate
attorneys' fees. Siegler v. Williams, 658 S.W.2d 236, 241 (Tex. App.--Houston [1st Dist.] 1983,
no writ).

 Based on the evidence in this case and the trial court's basis for awarding the
various damages, we do not believe the trial court abused its discretion in awarding Karen
attorneys' fees or that this award resulted in a double recovery for her. We overrule Richard's
seventh point of error.



CONCLUSION


 We have overruled all of appellants' points of error in this case. Accordingly, we
affirm the judgment of the trial court.



 

 Jimmy Carroll, Chief Justice

Before Chief Justice Carroll, Justices Aboussie and Kidd

Affirmed

Filed: August 28, 1996

Publish 



nce to any guiding rules and
principles. Capellen v. Capellen, 888 S.W.2d 539, 543 (Tex. App.--El Paso 1994, writ denied). 
Further, it is presumed that the trial court exercised its discretion properly. Murff, 615 S.W.2d
at 699.

 As indicated in its findings of fact, the trial court considered many factors in
making this division, including:



(1) Relative earning capacity of the parties;


(2) Attorneys' fees incurred and paid or owed to be paid by Karen at the time of
trial;


(3) Future employability of the spouses;


(4) Earning power, business opportunities, capacities, and abilities of the
spouses;


(5) Nature of the property involved in the division;


(6) Wasting of community property by the spouses;


(7) Creation of community property by the efforts of Karen; and


(8) Other matters . . . relating to the wrong doing of Richard.



In light of these factors and the evidence in the record, we do not believe the court abused its
discretion in awarding a disproportionate division of property to Karen along with the damages
for Richard's and Hudson's tortious conduct. We overrule these points of error.

 In his seventh point of error, Richard asserts that the trial court erred in awarding
Karen attorneys' fees because the jury considered attorneys' fees in its award of damages for
fraud. Richard argues that it is highly probable that this error resulted in a double recovery for
Karen because her total attorneys' fees were $31,041.65, an amount almost identical to the jury's
award of $30,000 in exemplary damages. Karen responds by claiming that the punitive damage
amount is not a grant of attorneys' fees and that the expenditure of attorneys' fees was just one
factor that was considered in arriving at the amount of an award of punitive damages.